WILIAM ESTUARDO LUIS ISCHIU,

     Petitioner,

     v.

                      Civil Action No. TDC-17-1269

NELY DEL ROSARIO GOMEZ GARCIA,

     Respondent.

## MEMORANDUM OPINION

When a parent flees to another country with a child in contravention of the other parent's custody rights, the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, generally requires the child's immediate return so that custody rights can be determined in the child's country of habitual residence. In this case, Wiliam Estuardo Luis Ischiu ("Luis Ischiu") alleges that his wife, Nely del Rosario Gomez Garcia ("Gomez Garcia"), wrongfully removed their minor child, W.M.L.G., from their native country of Guatemala to the United States. He has filed a Petition under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 9001-9011 (2012), seeking W.M.L.G.'s return to Guatemala under the Hague Convention. Upon consideration of the Petition, the submitted briefs, and the evidence presented during a bench trial, the Petition is denied.

## BACKGROUND

Over the course of a two-day bench trial on July 19 and 21, 2017, Gomez Garcia offered the following witnesses: Evelyn Karina Leiva Magariño, an attorney and expert witness on

Guatemalan law; Gomez Garcia; Dr. Lorna Sanchez, a clinical psychologist who evaluated Gomez Garcia; and Blondina Gomez Garcia, the Respondent's sister, who testified by video conference from Guatemala. Luis Ischiu presented the following witnesses: Professor Joel Alfonso Lopez Mendez, an attorney and expert witness on Guatemalan law; Julia Elena Ischiu, the Petitioner's mother; Sonia Marilu Diaz Paschual, the wife of Mario Alejandro Luis Ischiu, one of the Petitioner's brothers; Sergio Annibal Luis Ischiu, the Petitioner's brother; Veronica Elizabeth Figueroa Calderon, the wife of Sergio Luis Ischiu; Alberto Luis Escobar, the Petitioner's father; and Luis Ischiu. With the exception of Luis Ischiu, all of the Petitioner's witnesses testified by videoconference from Guatemala. At the request of the Respondent, the Court also conducted an *in camera*, on-the-record interview of W.M.L.G. on July 25, 2017. Based on this testimony and the documentary evidence presented, the Court makes the following findings of fact.

Gomez Garcia met Luis Ischiu when she was 17 years old. She had to take two buses to go to school, and when at a transit point in Luis Ischiu's hometown, Luis Ischiu approached her. After dating for two years, they were married in 2009, when she was 19 and Luis Ischiu was 29. Gomez Garcia went to reside in a family compound with Luis Ischiu, his parents, and Luis Ischiu's brothers, their wives, and their children.

Gomez Garcia testified that from the time that she married Luis Ischiu and moved into the family compound, his attitude toward her changed. He did not allow her to sleep with him, except when he wanted to have sex with her, and instead required her to sleep in the living room. Her mother-in-law required her to wear the clothes of someone from the Mayan indigenous group to which Luis Ischiu belonged and did not allow her to wear the clothes that she, a member of the Ladina ethnic group, used to wear. Although all of the wives of Luis Ischiu's

brothers were also Ladina, Gomez Garcia's mother-in-law disfavored W.M.L.G. because he was light-skinned and looked like Gomez Garcia. Gomez Garcia was required to work for the family cable business seven days a week, with a half day on Sunday; she had to attend church during the remaining half day. She brought W.M.L.G. to work with her and carried him on her back. Although she was technically paid a below minimum wage amount of 500 quetzales per month, the equivalent of $70, the money was spent by others on household needs, so she did not compile any savings of her own.

In 2016, Gomez Garcia was sexually assaulted by members of her husband's family, specifically, Luis Ischiu's father and brother. On multiple occasions, Luis Ischiu's father tried to have sexual contact with her. Specifically, when no other adults were present, he went into the kitchen, came up to Gomez Garcia, held her tight to him, and touched her private parts. Luis Ischiu's brother Carlos also sexually molested her in the same manner. When Gomez Garcia told Luis Ischiu about the sexual abuse, he did nothing to defend her and instead threatened her that she must not speak to anyone about it. At other times, Luis Ischiu physically assaulted her. On one occasion, she discovered that he was having an affair and confronted him. He then hit her on her back, knocking her to the ground. He told her that his activities were none of her business and that her role was to be his servant and to take care of their son. In another incident, when she asked him about a message on his cell phone from another woman, he kicked her and she was unable to defend herself. Another time, Luis Ischiu struck Gomez Garcia in the face while W.M.L.G. watched. Both Luis Ischiu and his brothers verbally abused Gomez Garcia with profane language, including in front of W.M.L.G. According to Gomez Garcia, W.M.L.G. was aware when Luis Ischiu assaulted her. She testified that as a result of that exposure, and his disfavored treatment within the family compound, he generally appeared sad and troubled.

Although Garcia Gomez believed that everyone in the household knew she was being assaulted, no one in the family came to her aid. She had nowhere else to go. Gomez Garcia's parents and other relatives lived a 30-minute drive away, and she did not have access to a car. On one of the few occasions when Gomez Garcia saw her relatives, her sister observed that she had bruises on her arms. On multiple occasions, Luis Ischiu and his family members threatened to kill her if she tried to leave the home and to take W.M.L.G. away. On two occasions, Gomez Garcia attempted to commit suicide. The first time, she drank rat poison. When she told Luis Ischiu, he offered to take her to the doctor, but she declined because she had already vomited the poison. The second time, she tried to overdose on pills. He suggested that she drink a lot of water and try to vomit. After she vomited, he offered to take her to the doctor, but she again declined. Other than searching the house for poison and pills, Luis Ischiu took no steps to prevent any future suicide attempts. Neither he nor any of the members of his family sought any medical or mental health treatment for Gomez Garcia as a result of these suicide attempts. Rather, Luis Ischiu's reaction was that she must not love him and W.M.L.G. if she wanted to kill herself.

When she finally gathered up the courage to leave in November 2016, she fled to her parents' home. She then applied for and received a Security Measures Order against Luis Ischiu from a Guatemalan court. The November 23, 2016 Order, effective for a period of six months, prohibited Luis Ischiu from contacting Gomez Garcia at home or work and from harassing or intimidating any member of her family; ordered that he pay provisional child support; and provisionally suspended Luis Ischiu's guardianship and custody rights over W.M.L.G. The Order also warned that Luis Ischiu would be charged with disobedience if he continued to attack and mistreat Gomez Garcia or her family.

4

Although Luis Ischiu was given two days to respond to the Order and did so, the court left the Order in place without alteration. Shortly after the Security Measures Order was issued, Luis Ischiu, his father, mother, and brothers went to Gomez Garcia's parents' home in search of Gomez Garcia and W.M.L.G. When Gomez Garcia's father refused to allow them to enter, Luis Ischiu shouted that he would look for her wherever she went and would kill her or her family if they did not tell them where she was. Gomez Garcia and her family then gathered and decided that they should send Gomez Garcia and W.M.L.G. to the United States, where they had arranged through extended family for a place for them to stay. They borrowed the equivalent of $4,000, secured by a lien on their farming plot, and she and W.M.L.G. traveled by bus through Mexico to the United States. Gomez Garcia requested asylum and was paroled into the United States. She now resides in Maryland and has an upcoming asylum hearing date in November 2017. Meanwhile, on May 23, 2017, the Guatemalan court extended the Security Measures Order for another six months. Then on July 7, 2017, the court terminated the order as to Gomez Garcia and W.M.L.G. because they are now in the United States, but left the protection order in place as to Gomez Garcia's family in Guatemala.

Since arriving in the United States, Gomez Garcia has been evaluated by Dr. Lorna Sanchez, a clinical psychologist with a specialty in cross-cultural and bilingual clinical psychology. Her evaluation consisted of 10 hours of interaction with Gomez Garcia and various psychological tests. Dr. Sanchez has diagnosed Gomez Garcia with post-traumatic stress disorder ("PTSD") and clinical depression with anxiety, with the stressors in her life including abuse by her husband and the sexual abuse by her husband's relatives, as well as an incident during which she was raped by a relative at age nine. Based on the testing, Dr. Sanchez does not believe that Gomez Garcia is fabricating the abuse and concludes that Gomez Garcia fled to the

5

United States out of fear for her life and the need to survive. Since arriving in the United States, her risk for suicide has diminished. Dr. Sanchez concluded, however, that if forced to return to Guatemala, Gomez Garcia would be in a state of terror and fearful for her life, which would cause serious deterioration in her mental state. Dr. Sanchez believes that under those circumstances, the distress of his mother would affect W.M.L.G., because psychological distress experienced by the primary caregiver always has a corresponding impact on the child. As a result, W.M.L.G. could develop PTSD, depression, and anxiety, and he could suffer developmental delays.

In his *in camera* interview with the Court on July 25, 2017, W.M.LG., who is six and a half years old, was reserved but displayed sufficient intelligence and maturity to understand the Court's questions and to provide responsive answers candidly, without signs that he had been coached. He did not, however, appear to be able to provide as much detail in his answers as an older child without a language barrier would have been able to provide. W.M.L.G expressed a preference to be with his mother, who treated him well, and stated that he did not miss living in Guatemala and would not want to live with his father. He described his father as bad for causing harm to his mother. He has heard his father verbally abuse his mother, using terms like "piece of shit," and he has witnessed his father physically assault her, on one occasion, when his father "smashed" his mother's face. W.M.L.G. said his parents fought every day in Guatemala such that he did not feel safe living in Guatemala. His uncles, Luis Ischiu's brothers, also argued with and used "bad words" towards Gomez Garcia. W.M.L.G. also stated that he did not like living in the family compound and that his grandmother, Luis Ischiu's mother, treated his cousins better than she treated him, such as when she would go out with the other children but leave him behind. He reported that his cousins would sometimes fight with him. W.M.L.G. told the Court

that he would be afraid that his parents would fight and that his mother would get hurt if they were all together again. He also expressed a belief that if he returned to Guatemala with his mother, his father and grandfather would come to get him and make him live with them.

## DISCUSSION

Luis Ischiu has petitioned this Court to return his child, W.M.L.G., to Guatemala pursuant to the Hague Convention. Gomez Garcia argues that Luis Ischiu has not established a *prima facie* case because he did not have custody rights over W.M.L.G. at the time of the removal. She also raises the affirmative defenses that W.M.L.G. objects to return to Guatemala and is of sufficient age and maturity that his views on return should be considered by the Court in making its determination, and that W.M.L.G. would be subject to a grave risk of physical or psychological harm if returned to his home country.

### I.    Legal Standard

The Hague Convention, to which the United States and Guatemala are signatory parties, is a multilateral treaty designed "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and . . . to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention art. 1. It is meant "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (internal citation omitted).

The United States has implemented the Hague Convention by statute in ICARA. To secure the return of an abducted child under ICARA, a petitioner must prove, by a preponderance of the evidence, that the child was "wrongfully removed" under the meaning of the Hague Convention. 22 U.S.C. § 9003(e)(1)(A). If the petitioner establishes wrongful

removal, the respondent must return the child unless the respondent can show that an exception applies under the Hague Convention. *See Miller*, 240 F.3d at 398. Here, Gomez Garcia asserts that two exceptions apply. The first exception, under Article 13 of the Hague Convention, is that the court finds, by a preponderance of the evidence, "that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention art. 13; 22 U.S.C. § 9003(e)(2)(B). The second, under Article 13(b), is that there is a "grave risk" that return would expose the child to "physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). This exception must be established by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A); *Miller*, 240 F.3d at 398.

## II.     Wrongful Removal

Removal is "wrongful" under the Hague Convention where: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal, (2) the removal violated the petitioner's custody rights under the law of the home country, and (3) the petitioner had been exercising those rights at the time of removal. *Bader v. Kramer* (*Bader II*), 484 F.3d 666, 668 (4th Cir. 2007). The first and third elements are not in dispute. The issue is whether the Petitioner, Luis Ischiu, had custody rights within the meaning of the Hague Convention at the time of removal. The Hague Convention defines custody rights as the "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention art. 5(a). The analysis is based on the custody status at the time of the alleged wrongful removal. *See White v. White*, 718 F.3d 300, 307 (4th Cir. 2013); *Miller*, 240 F.3d at 401.

Here, the removal occurred on December 4, 2016. At that time, Luis Ischiu and Gomez Garcia remained married. Petitioner's expert witness, Professor Joel Alfonso Lopez Mendez, testified that in Guatemala, biological parents have parental rights under the doctrine of *patria potestas*. This Roman law concept, which originally referred to the absolute authority of the father over his child, generally refers to the rights of both biological parents to exercise authority over their children. *See Whallon v. Lynn*, 230 F.3d 450, 456–57 (1st Cir. 2000). *Patria potestas* is codified in the Chapter on Parental Authority of the Guatemalan Civil Code, which provides that "Within marriage and outside of it, parental authority is exercised over the minor children jointly by the father and the mother in the marriage." Chapter VII of the Civil Code of Guatemala, ¶ 252. "Parental authority" covers "the right to legally represent a minor . . . in all civil acts . . . to administer his or her assets and to take advantage of available services in view of his or her age and condition." *Id.* ¶ 254

According to Lopez Mendez, this *patria potestas* parental authority includes the right to take care of the child and to decide on his residence. Under Paragraph 255 of the Chapter on Parental Authority, these parental rights are held "as long as the marital union . . . survives." *Id.* ¶ 255. Although "in the event of separation or divorce" the parental rights are exercised by "the parents having custody" over the child, Lopez Mendez gave undisputed testimony that in Guatemala, separation for this purpose requires a formal, judicial determination of separation, which did not happen here. Thus, it is not seriously disputed that in the absence of any intervening order, Luis Ischiu's parental authority rights gave him custody rights within the meaning of the Hague Convention. Several courts have found that custody rights can stem from *patria potestas* rights under the foreign country's laws. *See, e.g., Garcia v. Pinelo*, 808 F.3d 1158, 1164 (7th Cir. 2015); *Whallon*, 230 F.3d at 459.

Gomez Garcia argues that a November 23, 2016 Security Measures Order entered by a judge of the Magistrate's Court of San Juan Ostuncalco in Guatemala stripped Luis Ischiu of his custody rights. Specifically, the Security Measures Order prohibited Luis Ischiu, for a six-month period, from accessing Gomez Garcia's home or harassing any of her family members. It also established a requirement that he pay child support and stated that "We provisionally suspend for the alleged aggressor the guardianship and custody of the minor son." Trial Ex. 1B, at 3.

Lopez Mendez testified that this order did not rescind Luis Ischiu's custody rights, such as the right to determine the child's residency in or out of the country. According to Lopez Mendez, the suspended rights of "guarda" and "custodia" are the rights to live with the child and the right to have direct supervision over and to care for the child. These rights do not include the right to determine the child's residence, which he testified is within the *patria potestas* rights as a "civil act" under Paragraph 254. Rather, Lopez Mendez testified that the order essentially served only to temporarily suspend Luis Ischiu's right of *access* to the child as a protective measure due to the domestic violence complaint. Under Article 5 of the Hague Convention, "rights of access" are different than custody rights and include "the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention art. 5(b).

Gomez Garcia's expert witness, Guatemalan attorney Evelyn Karina Leiva Magariño, disagreed in that she asserted that the Security Measures Order rescinded Luis Ischiu's custody rights under the Hague Convention. She initially described the suspended "guarda y custodia" rights as "the right to live with the child and to take care of the child," which would not include the right to determine the child's residence. She later added that the suspension of these rights gave the mother the sole right to "decide where the child can live better."

Her testimony, however, was internally inconsistent. Leiva Magariño later agreed that Luis Ischiu retained the rights to provide for the child and "to care for the child"; he just could not "be in contact" with the child. She also agreed that the Security Measures Order did not grant the Gomez Garcia the right to make decisions that would have a permanent effect on the child after the end of the six-month period. So parts of her testimony corroborated Lopez Mendez's interpretation of the Security Measures Order as a restriction on access rights rather than custody rights.

Upon consideration of all of the testimony and evidence presented, the Court credits Lopez Mendez's testimony and concludes that the Security Measures Order did not deprive Luis Ischiu of custody rights under the Hague Convention. Beyond the fact that Lopez Mendez has significantly more experience as an attorney and has more specific expertise in the area of law at issue than Leiva Magariño, his interpretation is more persuasive for three reasons.

First, the Security Measures Order is plainly aimed at protecting the safety of Gomez Garcia rather than rescinding parental rights. The Security Measures Order was issued pursuant to the "Law to prevent, penalize and eradicate domestic violence," specifically, Paragraph 7 with the heading "Safety Measures." Law to Prevent, Punish, and Eradicate Family Violence, Congressional Decree, No. 97-1996 (1996) (Guat.). In this context, it clearly is not the equivalent of an order rescinding parental rights.

Second, Guatemalan law specifically identifies ways that parental authority can be rescinded. In addition to a grant of custody under Paragraph 255 following legal separation or divorce, which did not happen here, parental authority may be lost under Paragraph 274 when one of five enumerated events takes place. Chapter VII of the Civil Code of Guatemala ¶ 274. The issuance of an order such as the Security Measures Order is not one of them. *See id.*

Third and most importantly, in two subsequent orders, the same judge who issued the November 23, 2016 Security Measures Order clarified the meaning of that order. On May 23, 2017, in an order extending the Security Measures Order, the judge stated that "if it is a matter of parental authority, the interested parties must appear before the appropriate court to assert their rights, since this court is not competent to hear such matters." Trial Ex. 3B, at 2. On July 7, 2017, in an order extending the protections for Gomez Garcia's family but ending them for Gomez Garcia and W.M.L.G. because they were no longer in Guatemala, the same judge stated that it was not "on the record that the father of the minor lost the *patria potestas* judicially or through any other legal means according to what has been established in the current civil law" and that "during the period of the security measures the father never lost the right of guard and custody and *patria potestas* over [the] minor . . . because it was suspended in a provisional way and not in a definitive way according to the law." Trial Ex. 4B, at 3-4.

A close reading of these orders reveals that these statements were not new orders applicable only to the post-removal time period. Rather, they clarify the meaning of the original November 23, 2016 Security Measures Order and reflect the issuing judge's intention and understanding of Guatemalan law that the Security Measures Order did not deprive Luis Ischiu of his parental rights and that the issuing court did not even have jurisdiction to do so. The Court gives great weight to this interpretation by the issuing judge in Guatemala.

Although Gomez Garcia relies on *White v. White*, 718 F.3d 300, 306-07 (4th Cir. 2013), that case is notably different. In *White*, the United States Court of Appeals for the Fourth Circuit held that a father lacked custody rights under the Hague Convention when a legal separation order issued by a court explicitly awarded "the custody of the child" to the mother and only gave the father "visitation rights." *Id.* at 302, 304-05. When the father argued that his underlying

parental authority rights were not explicitly revoked, the Fourth Circuit relied on a Swiss Supreme Court case, and a ruling of a Swiss court in the case in question, in concluding that someone with exclusive custody under a court order was entitled to move abroad without consent of the other parent. *See id.* at 304-05.

In *White*, the order was akin to a legal separation order that could have been issued in Guatemala under Paragraph 255. Here, the order was a temporary Security Measures Order to provide safety to domestic violence victims, not a custody order issued upon legal separation. In *Nicolson v. Pappalardo*, 605 F.3d 100 (1st Cir. 2010), where a child was removed from Australia to the United States, the court held that the father retained the right to have permanent custody determined in Australia even though there had been a temporary order for protection from abuse entered against him in which he assented to the mother receiving "temporary parental rights and responsibilities" for up to two years. *Id.* at 103, 109. The court recognized the distinction between protection orders and custody orders when it stated, "A protection from abuse order is primarily concerned with dealing with an immediate threat of abuse and, where there are minor children, making arrangement for temporary custody. . . . Permanent custody is a different subject almost certainly of great importance to the parents and not one that would necessarily be addressed in any way in a consent order providing for temporary protection and custody." *Id.* at 108. Gomez Garcia has not identified, and the Court has not found, any case law in which a temporary domestic violence restraining order was deemed to have eviscerated Hague Convention custody rights. Furthermore, in *White*, the court relied on a Swiss court's interpretation that the separation custody order effectively gave the custody rights to the mother. 781 F.3d at 305. Here, the Guatemalan court has explained that the Security Measures Order did *not* alter parental rights.

This case is therefore closer to *Bader v. Kramer (Bader I)*, 445 F.3d 346 (4th Cir. 2006), in which the child was living with the mother at the time of the divorce, and, when the parents each petitioned for sole custody, the court issued an order setting a visitation schedule for the father and a child support award before the child was removed from the country. *Id.* at 348. The court held that because the visitation and child support awards addressed rights of *access* and did not constitute decisions on rights of custody, the father still had his custody rights through his general parental responsibility under German law. *Id.* at 350-51. Here, based on the expert testimony and the Guatemalan court's interpretation of its own order, the Security Measures Order likewise did not rescind Luis Ischiu's general parental rights, which include the right to decide the child's residence and custody rights under the Hague Convention.

The replacement of Articles 50 and 53 of the Guatemalan Immigration Law, Immigration Law, Congressional Decree, No. 95-98 (1998) (Guat.), by Articles 61 and 91 of the Migration Code, Migration Code, Congressional Decree, No. 44-2016 (2016) (Guat.), and the failure of the Guatemalan court to bar removal of the child from Guatemala as part of the Security Measures Order, do not alter this conclusion. Arguably, these new provisions replaced a provision that provided a *ne exeat* right—a right to prevent the child from leaving the country—specifically, the provision requiring both parents to consent to the issuance of a passport to a child. *See* Immigration Law, Congressional Decree, No. 95-98, art. 53. It is not clear that these articles eliminated any preexisting *ne exeat* right, since Article 61 still requires consent from both parents prior to removal, or "from the parent who exercises parental authority, custody, or guardianship," Migration Code, Congressional Decree, No. 44-2016, art. 61, which may simply indicate that only one parent is needed when the other parent's parental rights have been rescinded. The Court need not decide this issue. Although a parent with a *ne exeat* right would

14

necessarily have custody rights, *see Abbott v. Abbott*, 130 S. Ct. 1983, 1995 (2010), such a right is not a requirement to establish custody rights. As in *Bader I*, custody rights, such as those arising from *patria potestas* rights, can exist without regard to whether the home country has explicitly provided a *ne exeat* right. *See* 445 F.3d at 350. The Court therefore finds that Luis Ischiu has established a wrongful removal under the Hague Convention.

## III. Article 13

Gomez Garcia seeks denial of the Petition on the grounds that W.M.L.G., at the age of six and a half years, is of sufficient "age and degree of maturity" to express the view that he does not want to return to Guatemala. Hague Convention art. 13. Although there is no specific age below which a child could not be considered sufficiently mature to express such a view, this exception is typically applied when the child is older than W.M.L.G. *See, e.g., Rodriguez v. Yanez*, 817 F.3d 466, 469, 474, 477-78 (5th Cir. 2016) (upholding consideration under the age and maturity exception of the views of a child who was nine years old at the time of the district court proceedings, but remanding for a determination whether the child objected to return); *DeSilva v. Pitts*, 481 F.3d 1279, 1286-88 & n.7 (10th Cir. 2007) (upholding the district court's consideration of the views of a 13-year-old child under the age and maturity exception).

As discussed above, the Court found W.M.L.G. sufficiently mature to understand and respond to factual questions, and thus considers his statements on the issue of whether return would impose a grave risk to the child. *See Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001) (upholding consideration of the testimony of an eight-year-old child as part of the "grave risk" analysis). However, although W.M.L.G. expressed views on where and with whom he would like to live, the Court does not find W.M.L.G. to be sufficiently mature to make the type of decision regarding his future as contemplated by Article 13. Although W.M.L.G. can describe

15

factual events that occurred in the past, it is unclear whether he fully appreciates the longer term implications of residing in the United States as opposed to Guatemala. The Court therefore declines to consider W.M.L.G's views on where he should reside under the "age and degree of maturity" exception.

## IV. Article 13(b)

### A. Grave Risk

Even where wrongful removal has been established, under Article 13(b) of the Hague Convention, the Court "is not bound to order the return of the child" if the respondent can establish by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b); 22 U.S.C. § 9003(e)(2)(A). To avoid circumventing the underlying purpose of the Hague Convention, this exception must be construed narrowly. *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007). The narrow construction, however, should not give way to "the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." *Id.* (citation omitted).

Although there is no clear definition of what constitutes "grave risk," the respondent "must show that the risk to the child is grave, not merely serious." *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10510 (Mar. 26, 1986)). The risk must be more than the trauma associated with uprooting and moving the child back to the country of habitual residence. *See id.* at 1068 ("A removing parent must not be allowed to abduct a child and then— when brought to court—complain that the child has grown used to the surroundings to which they were abducted."); *see also Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) ("[T]he harm

must be something greater than would normally be expected on taking a child away from one parent and passing him to another." (citation omitted)).

Domestic abuse can provide a basis for a finding of grave risk. Certainly, sexual abuse of the child would constitute a grave risk of placing the child in an intolerable situation. *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10510 (Mar. 26, 1986) ("An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child."); *Simcox*, 511 F.3d at 606 (stating that the State Department's comments on the Hague Convention are afforded "great weight"). Significant physical and verbal abuse of a spouse and child can also establish a grave risk. *See, e.g., Simcox*, 511 F.3d at 598-99, 608-09 (finding grave risk arising from the father's verbal and physical abuse of the mother in the children's presence, as well as "frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and pulling [of] hair and ears" against the children); *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (finding evidence of grave risk sufficient to deny summary judgment where the father frequently and seriously beat, kicked, and choked the mother, verbally abused her, struck the child on several occasions, and threatened to kill the mother and the children).

Courts have found grave risk based on domestic abuse of the spouse in the presence of the children, even without abuse directed at the children themselves. In *Walsh*, the court found grave risk based on a long history of the father physically beating the mother, including in front of the children, as well as a history of fighting others, threatening to kill another, and a history of violating court orders. *Walsh*, 221 F.3d at 211, 219–20. Likewise, in *Baran v. Beaty*, 526 F.3d 1340, 1345-46 (11th Cir. 2008), the United States Court of Appeals for the Eleventh Circuit found grave risk where the father had verbally and physically abused the mother in the child's

presence, and threatened to harm the child, but did not physically abuse the child. *Id.* at 1346. In such cases, courts have noted the psychological harm inflicted on the child witnessing the abuse of the parent and the increased risk that the child would be similarly abused. *See, e.g., Walsh*, 221 F.3d at 220 ("[C]hildren are at an increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser.").

Not every case involving abuse, however, presents a grave risk. In *Whallon*, the court did not find grave risk where the father verbally abused the mother and an older child and, on one occasion, shoved the mother and threw a rock at her car, but did not physically or psychologically abuse the child at issue on the petition. 230 F.3d at 453, 460. Similarly, in *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374 (8th Cir. 1995), the father's physical, sexual, and verbal abuse of the mother was not enough to constitute grave risk where there was no evidence that the father abused the six-month-old child, since grave risk is concerned with whether the child would suffer upon return, not the parent. *Id.* at 376-77.

The assessment of the evidence relating to grave risk depends significantly on the credibility of the witnesses. Having heard and observed her testimony, the Court finds Gomez Garcia to be highly credible. She had difficulty recounting the incidents of physical and sexual abuse, became emotional at times, and appeared to be reliving the events during her testimony, including appearing visibly anguished when describing her husband's failure to protect him from sexual abuse by his father and brother. She expressed sincere fear of Luis Ischiu and his family. Notably, many key parts of her testimony were unrebutted, including her testimony that Luis Ischiu's brother Carlos sexually assaulted her; that when she reported the sexual abuse by Luis Ischiu's father and brother, Luis Ischiu took no action and threatened her into silence; that Luis Ischiu and others threatened to kill her if she fled the compound; and that she fears the family

because Carlos Luis Ischiu is a member of a gang in Guatemala. Gomez Garcia's testimony was corroborated by the expert testimony of Dr. Sanchez, who found no sign that Gomez Garcia was fabricating the abuse and diagnosed her with PTSD, depression, and anxiety caused by the abuse; the testimony of her sister, who observed bruises on Gomez Garcia; the interview of W.M.L.G., who was present for physical and verbal abuse; and the fact that the Guatemalan court not only issued the Security Measures Order, but renewed it in full in May 2017 and affirmed it again in July 2017 with respect to Gomez Garcia's family.

Luis Ischiu and his family members offered contrasting testimony on a number of key points. Luis Ischiu acknowledged that his marriage was troubled but denied physically abusing his wife and accused her of being "unfaithful," in the form of kissing a 15-year-old boy. He also stated that she had talked about wanting to move to the United States and alleged that she did so after meeting a man over the internet, but he did not suggest that the relationship was adulterous. His family members denied that Luis Ischiu's mother treated Gomez Garcia or W.M.L.G. differently than the other daughters-in-law and grandchildren, noted that the other daughters-in-law are all of the same ethnic background as Gomez Garcia, denied that Gomez Garcia was required to dress in traditional Mayan attire, and presented photographs from family events in which W.M.L.G. appeared to be happy. Luis Ischiu's father denied sexually abusing Gomez Garcia. Both Luis Ischiu and his father denied seeking to find Gomez Garcia at her parents' house after the issuance of the Security Measures Order.

The Court did not find Luis Ischiu and his family members to be credible witnesses. Gomez Garcia's two sisters-in-law appeared visibly scared as they testified. Given that they appeared by videoconference and saw only a broad view of the courtroom, the fear they displayed was most likely the result of coercive factors present in Guatemala. Both also falsely

testified that they had never spoken to Luis Ischiu's American attorneys. Under these circumstances, the Court discounts their testimony. More broadly, Luis Ischiu's relatives who testified, consisting of his father, mother, brother Sergio Luis Ischiu, and sisters-in-law Sonia Marilu Diaz Paschual and Veronica Elizabeth Figueroa Calderon, gave answers that were so strikingly similar that they were clearly coordinated. For example, when asked to describe the marriage between Gomez Garcia and Luis Ischiu, three witnesses stated that they, "like any other couple," "any other marriage," or "every marriage," had moments where they had "discussions or arguments." Each witness who was asked testified that Luis Ischiu's mother treated all of her grandchildren "equally." Luis Ischiu's father and sister-in-law Sonia Marilu Diaz Paschual gave matching testimony that Luis Ischiu's mother treats the daughters-in-law as daughters because she has "never had any daughters" (father) and "no daughters of her own" (Sonia Marilu Diaz Paschual), and that the father would not have sexually molested Gomez Garcia because he "has treated her like a daughter" (father) or "sees us as daughters" (Sonia Marilu Diaz Paschual). And each family member who was asked provided substantially similar testimony about Gomez Garcia's work schedule, stating that as a family member, she was free to "arrive when[ever] she wanted to" or "leave when[ever] she wanted to." Whether coerced or coached, the testimony of Luis Ischiu's relatives was not reliable.

As for Luis Ischiu, he made several inconsistent if not false statements to the Court. In his testimony, he claimed that he had not known that his wife was planning to flee to the United States, in contradiction of his statement to the Guatemalan court in response to the Security Measures Order that he knew she was planning to move to the United States because she felt bad about her "unfaithfulness" to him. Trial Ex. 2B, at 7-8. In the Petition, he asserted that W.M.L.G. "attends school" in his hometown, Pet. ¶ 14, but acknowledged in his testimony that

W.M.L.G., though scheduled to go to school in January 2017, had never actually attended school in Guatemala. In the Petition, Luis Ischiu also asserted that there are no "prior agreements or court orders between the parties concerning custody of the child," *id.* ¶ 22, but failed to disclose the existence of the Security Measures Order, which referenced the suspension of guardian and custody rights. His denials of physically abusing his wife rang hollow when he acknowledged that he would hit his wife if he discovered that she was having an affair with another man. His demeanor was also troubling. He did not appear overly concerned with the prospect of his son remaining in the United States and smiled frequently during his testimony. The Court does not consider him to be a credible witness.

With this backdrop, the Court concludes that Gomez Garcia has presented clear and convincing evidence that she was subjected to physical and sexual abuse by Luis Ischiu and his family, and that as a result there would be a grave risk of psychological harm to W.M.L.G., and he would be placed in an intolerable situation, if he were returned to Guatemala. Gomez Garcia was the victim of abuse at the hands of not only her husband, but also members of his family. Most egregiously, her father-in-law Alberto Luis Escobar and her husband's brother Carlos Luis Ischiu sexually abused her on multiple occasions. Specifically, when alone with her, Alberto Luis Escobar pulled her tight and grabbed her "private parts." Carlos Luis Ischiu engaged in similar activity. When Gomez Garcia reported the molestation to her husband, Luis Ischiu did nothing to stop it but instead warned her not to speak of it to anyone else. Notably, the vast majority of this testimony was undisputed. Although Carlos Luis Ischiu was listed as a witness, he did not testify. And Luis Ischiu never disputed Gomez Garcia's testimony that she had told him about the sexual abuse by his father and brother, or that he had refused to do anything to stop it.

In addition to this sexual abuse by Luis Ischiu's relatives, Gomez Garcia also suffered physical abuse at the hands of her husband. On at least three occasions, Gomez Garcia physically assaulted her, attacks which included smashing her in the face and knocking her to the ground. Her sister later observed bruises on Gomez Garcia. She was also verbally abused by her husband and his brothers.

Faced with such abuse, Gomez Garcia had no place to turn. No one in the family compound came to her aid. According to Gomez Garcia, the wives of Luis Ischiu's brothers also suffered abuse and "live in fear." Her parents lived 30 minutes away by car, and she had no access to a vehicle. Her husband and his family members also threatened, on multiple occasions, to kill her if she fled the family compound, and she gave unrebutted testimony that Carlos Luis Ischiu is a member of a gang. When she then attempted suicide on two occasions, Luis Ischiu did nothing other than offer to take her to the doctor and look for poison or pills in the house. There was no effort by anyone in the family to get help for Gomez Garcia to prevent another attempt. When she finally fled and obtained the Security Measures Order, Luis Ischiu immediately violated that order when, accompanied by his parents and brother, he appeared at the home of Gomez Garcia's parents, demanded to see Gomez Garcia and W.M.L.G., and threatened to find her and kill her.

Significantly, W.M.L.G. was aware of the abuse directed at his mother. He witnessed at least one of these physical attacks against his mother and heard verbal, profane abuse by his father and uncles against his mother. He is aware of the threat that, if he were returned to his mother's family home in Guatemala, his father and grandfather would likely come to take him away. Dr. Sanchez concluded that Gomez Garcia has PTSD and clinical depression with anxiety as a result of the abuse, and that if forced to return to Guatemala, she would be in a state of terror

and fear for her life. According to Dr. Sanchez, the likely deterioration in Gomez Garcia's mental state would put W.M.L.G. at risk for PTSD, depression, anxiety, and even developmental delay, because psychological stress on the primary caregiver always has a corresponding impact on the child.

As discussed above, significant physical abuse of the mother, particularly in the presence of the child, can establish a grave risk of harm to the child upon return, even without abuse directed at the child. *See, e.g., Walsh*, 221 F.3d at 211, 219-20; *Baran*, 526 F.3d at 1345-46. In *Hernandez v. Cardoso*, 844 F.3d 692 (7th Cir. 2016), the father beat and sexually assaulted the mother on multiple occasions, with some of the abuse occurring in front of the children, ages 14 and 8, and both parents used corporal punishment on the children. *Id.* at 695. The court denied a Hague Convention petition because "repeated physical and psychological abuse of a child's mother by a child's father, in the presence of the child (especially a very young child, as in this case), is likely to create a risk of psychological harm to the child." *Id.* (quoting *Khan v. Fatima*, 680 F.3d 781, 787 (7th Cir. 2012)).

That is the case here. Although the physical abuse inflicted on Gomez Garcia may not have reached the level of severity in *Walsh* or *Baran*, the combination of physical abuse by Luis Ischiu, sexual abuse by his father and brother, verbal abuse, and multiple, specific threats to kill Garcia Gomez, coupled with W.M.L.G.'s awareness and witnessing of some of the abuse, establishes a similar grave risk of harm to W.M.L.G. In particular, the perverse sexual abuse by Gomez Garcia's father-in-law and brother-in-law, implicitly condoned by her husband, presents a unique harm not present in other cases. The repeated threats to kill Gomez Garcia also heighten the risk. *See Gomez v. Fuenmayor*, 812 F.3d 1005, 1013 (11th Cir. 2016) (holding that a pattern of death threats and violence again a father, including a shooting, established a grave

risk of harm even though the threats were not specifically directed against the child). Finally, the fact that Luis Ischiu and his family were undeterred by a Guatemalan restraining order and brazenly went to Gomez Garcia's parents' home to find her and threaten to kill her raises serious concerns whether both Gomez Garcia and W.M.L.G. would be safe in Guatemala. *See Walsh*, 221 F.3d at 221 (considering the father's history of violating court orders as a factor in concluding that return of the child would impose a grave risk of harm). Between the potential psychological harm to W.M.L.G. that would derive from Gomez Garcia's legitimate fear for her safety if they were to return to Guatemala, and the physical risk that W.M.L.G. would be caught up in potential violence directed at his mother, the Court finds that returning W.M.L.G. to Guatemala would create a grave risk of harm to the child and place him in an intolerable situation.

### B. Undertakings

Where there is a finding of grave risk, courts are "not bound to order the return of the child." Hague Convention art. 13(b). Courts may nevertheless return a child if sufficient protection is afforded. *Simcox*, 511 F.3d at 605. To mitigate the risk, courts may impose a set of enforceable conditions on the return, known as "undertakings." "The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction." *Walsh*, 221 F.3d at 219. Undertakings may "accommodate [both] the interest in the child's welfare [and] the interests of the country of the child's habitual residence." *Van de Sande*, 431 F.3d at 571-72.

24

Here, Luis Ischiu has not requested undertakings in the event that the Petition is denied. Even if he had, under the present circumstances, undertakings would be inappropriate. Because of the grave risk caused by Luis Ischiu and his family, the Court would only consider return if W.M.L.G. remained in the custody of Gomez Garcia pending custody proceedings in Guatemalan courts. Pursuant to the July 7 Order, however, Gomez Garcia no longer has temporary custody of W.M.L.G. Thus, there is no assurance that W.M.L.G. will remain with Gomez Garcia upon return. Furthermore, based on the July 7 Order, Gomez Garcia and W.M.L.G. no longer have the protection of a Security Measures Order. Yet immediately prior to her departure from Guatemala, Luis Ischiu, his father, mother, and brother, went to the home of Gomez Garcia's parents, to which Gomez Garcia and W.M.L.G. had fled, and Luis Ischiu threatened to kill her if he found her. The Court therefore concludes that Gomez Garcia and W.M.L.G. would not be safe at her parents' home upon return to Guatemala. Gomez Garcia, however, has no financial ability to establish any alternative residence with W.M.L.G. in Guatemala. Her family had to borrow money against their land to finance Gomez Garcia's bus trip to the United States, and her father has since suffered an injury that has caused his hospitalization, so he is unable to work. Thus, if required to return to Guatemala with W.M.L.G., Gomez Garcia would undoubtedly have to return to her parents' home, a location known to Luis Ischiu and his family, located only 30 minutes away from their compound.

Even if the Security Measures Order were reinstated, Luis Ischiu and his relatives have shown a disregard for orders of Guatemalan courts. The visit by Luis Ischiu and his family to the home of Gomez Garcia's parents, during which Luis Ischiu threatened to kill his wife if he found her, occurred shortly after the issuance of the November 23, 2016 Security Measures Order, in clear violation of that order. With this history, the Court concludes that no

undertakings could be established that would sufficiently protect Gomez Garcia and W.M.L.G. Accordingly, the Petition shall be denied.

## CONCLUSION

For the foregoing reasons, it is hereby ordered that Luis Ischiu's Petition is DENIED. A separate Order shall issue.

Date:  August 14, 2017

THEODORE D. CHUANG
United States District Judge